```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROGER BUEHL & NUNO PONTES,   )
          Plaintiffs,        )   Civil Action No. 03-1538
                             )
     vs.                     )   Magistrate Judge Amy Reynolds Hay
                             )
KENT WARMAN; et al.,         )
          Defendants.        )
```

## OPINION AND ORDER

HAY, Magistrate Judge

Plaintiffs, Roger Buehl and Nuno Pontes, inmates formerly confined at the State Correctional Institution at Greene, located in Waynesburg, Pennsylvania, commenced this civil action against the Defendants[1] alleging that they violated Plaintiffs' First Amendment rights by prohibiting them from receiving the 2003 and 2004 issues of a publication known as the AK Press Distribution Catalog (AK Press Catalog).[2] In this regard, on May 2, 2003, Buehl received a notice that informed him

---

[1]   The Defendants include: Kent Warman, Chairman of the Incoming Publications Review Committee in 2003; John Does, members of said Committee in 2003; Thomas L. James, Grievance Coordinator for the Pennsylvania Department of Corrections in 2003; Sharon Burks, Grievance Coordinator in 2003 and Chief Coordinator in 2004; Kenneth Miller, Chairman of the Incoming Publications Review Committee in 2004; and Robert Does, members of said Committee in 2004.

[2]   "AK Press Distribution is part of AK PRESS, INC., the American Branch of AKA Book Cooperative Ltd., a workers' co-operative wholly owned by its members ... [whose] goal is to make available radical books and other materials, titles that are published by independent presses, not the corporate giants, titles with which you can make a positive change in the world. The sorts of books we stock are less and less available from the corporate publishers, booksellers & websites." Doc. 22, Ex. 8, p. 2.

that the 2003 AK Press Catalog was disapproved by the Incoming Publication Review Committee (IPRC) in accordance with Pennsylvania Department of Corrections (DOC) policy DC-ADM 803, "Inmate Mail and Incoming Publications." The reason provided was that the publication violated DC-ADM 803 VI.F. 3a(3):  "Writings which advocate violence, insurrection or guerilla warfare against the government or any of its institutions or which create a clear and present danger within the context of the correctional institution."  Doc. 22 at Ex. 5.  The notice informed Buehl that he had fifteen days to appeal the decision to the Superintendent or to make arrangements with the mail room to have the materials removed or they would be destroyed.  Plaintiff Pontes received a similar notice on April 18, 2003.  Doc. 22 at Ex. 6.

      Buehl appealed the rejection of the publication to the Superintendent, who denied the appeal on May 12, 2003, explaining in pertinent part that the publication "does contain a listing of products for sale which advocate violence, insurrection, or guerilla warfare against the government or any of its institutions or, which create a clear and present danger within the context of the correction institution."  Doc. 22 at Ex. 5.  Buehl sought final review and on June 9, 2003, the Chief Grievance Coordinator upheld the decision of the IPRC.

      On March 12, 2004, Pontes received a notice that informed him that the 2004 AK Press Catalog was disapproved by the IPRC in accordance with Pennsylvania Department of

Corrections (DOC) policy DC-ADM 803, "Inmate Mail and Incoming Publications."  The reason provided was that the publication violated DC-ADM 803 VI.F. 3a(3):  "Writings which advocate violence, insurrection or guerilla warfare against the government or any of its institutions or which create a clear and present danger within the context of the correctional institution."  Doc. 22 at Ex. 7.  The notice informed Pontes that he had fifteen days to appeal the decision to the Superintendent or to make arrangements with the mail room to have the materials removed or they would be destroyed.  Pontes appealed the decision and on March 24, 2004, the Superintendent upheld the decision disapproving the publication.  Pontes sought final review and on May 4, 2004, the Chief Grievance Coordinator upheld the decision of the IPRC.

      Plaintiffs then brought the instant suit pursuant to 42 U.S.C. § 1983.  In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to have a United States magistrate judge conduct all proceedings in this case, including the entry of a final judgment.  See Doc. 15.  Presently before the court for disposition is the Defendants' Motion for Summary Judgment.[3]

---

[3] Defendants supported their motion with evidentiary materials.  As well, Plaintiffs supported their response with additional evidentiary materials.

***Legal Standards and Discussion***

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The moving party "has the burden of showing there is no genuine issue of material fact, and once the moving party has sustained its burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial."  <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 464 (3d Cir. 1989)(<u>citing</u> <u>Celotex Corp.</u>, <u>supra</u> at 322-24).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 251-52 (1986).  Stated another way, "[w]here the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,475 U.S. 574, 587 (1986).  The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991) (quoting Anderson, 477 U.S. at 251-52).  If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.

To state a claim under 42 U.S.C. § 1983, plaintiffs must meet two threshold requirements.  They must allege: (1) that the alleged misconduct was committed by a person acting under color of state law; and (2) that as a result, they were deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).  At issue here is the second threshold requirement only.

Plaintiffs claim that the Defendants' decisions to deny Plaintiffs receipt of AK Press Catalogs violated their rights as

guaranteed by the First Amendment.[4]  The Supreme Court repeatedly has emphasized that, although prisoners do not shed all of their constitutional rights at the prison door, an inmate does not retain rights inconsistent with proper incarceration.  See Overton v. Bazzetta, 539 U.S. 126, 131 (2003) (citing Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977); Shaw v. Murphy, 532 U.S. 223, 229 (2001)).  Moreover, although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quotations omitted).  While federal courts must be cognizant of valid constitutional claims of prison inmates, the Supreme Court repeatedly has cautioned that the task of prison administration has been committed to the legislative and executive branches of government; federal courts should be reluctant to second guess these authorities.  See, e.g., Turner v. Safley, 482 U.S. 78, 84 (1987); O'Lone, 482 U.S. at 353.

---

[4]   The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

To ensure that the courts afford appropriate deference to prison officials, in Turner, the Supreme Court articulated a "reasonableness" test for federal court review of First Amendment constitutional claims concerning prison regulations and practices. Specifically, the Supreme Court stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. The court explained that such a deferential standard was necessary "if prison administrators and not the courts are to make the difficult judgments concerning institutional operations." Id. (internal quotation omitted).

In determining the reasonableness of government action that impacts a prisoner's constitutional rights, a court must consider four factors: (1) whether there is a valid, rational connection between the governmental action and a legitimate governmental interest; (2) whether there are alternative means of exercising the constitutional right that remains open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and (4) whether ready alternatives exist for accommodating the prisoners' right at de minimis costs to valid penological interests. Turner, 482 U.S. at 89-90. Analyzing Plaintiffs' claims under the

appropriate Turner test reveals that Defendants are not liable for the decisions disapproving the AK Press Catalogs.

As noted, the first prong of the Turner test requires the court to determine whether the action at issue -- here, refusing to allow Plaintiffs to receive the AK Press Catalogs -- has a rational connection to legitimate penological interests, in this case, security in the prison setting.[5]  The burden to prove the validity of the policy as applied to the particular catalogs at issue is not on the State but, rather, is on the prisoner to disprove it.  Overton, 539 U.S. at 132 (internal citations omitted).

We note that the case before us does not involve the constitutionality of the policy provision, i.e., DC-ADM 803 VI.F. 3a(3).  Rather, it is an "as applied" challenge to the decisions to ban the AK Press Catalogs under this provision.  In this situation, to defeat summary judgment, the Plaintiffs must show that there is a genuine issue of material fact regarding the applicability of the regulations to the materials, i.e., that there is an issue of fact as to whether the AK Press Catalogs contained "Writings which advocate violence, insurrection or guerilla warfare against the government or any of its institutions or which create a clear and present danger within the context of the correctional institution."  See Bahrampour v.

---

[5] There is no dispute that the promotion of internal security is the most legitimate of penological goals.  See Overton, 539 U.S. at 133; Thornburgh v. Abbott, 490 U.S. 401, 415 (1989).

Lampert, 356 F.3d 969, 973 (9th Cir. 2004) (in regard to regulation prohibiting materials that contained sexually explicit or role-playing content, the significant question was whether the magazines contained any of the prohibited content).

The evidence reflects that the PRC made specific determinations that the AK Press Catalogs included materials that advocated rebellion or created a clear and present danger within the context of a prison environment.  Specifically, the PRC was concerned about writings and slogans found on pages in the catalogs that advocated violence and disorder, and specifically referenced the advertisements for pins and T shirts that contained the following slogans and symbols:  Nazi signs, black power symbols, people with clubs in their hands advocating violence, "Ethnic Cleanser," "Bomb the Mall," "Prisons, America's Finest Slave Plantations," and "Whitey Will Pay."  See 2004 AK Press Catalog, pp. 198- 203 (Doc. 22 at Ex. 9).  Defendant Kenneth Miller testified that, based on his experience, the inmates could copy these pictures and blow them up and display them, which could incite racial violence and promote insurrection.  Testimony of Kenneth Miller, pp. 30-43 (Doc. 17 at Ex. E).

In response, Plaintiffs argue that the text of the catalogs themselves does not pose a threat to prison security, as opposed to the text of the particular books offered for sale

through the catalogs.[6]  Plaintiffs argue that because the synopses of the books offered for sale in the catalogs do not contain "how to" advice and because the books and other materials offered in the catalogs do not express novel concepts not heard before by Plaintiffs, the catalogs pose no security threat. Plaintiffs point out that the catalogs offer works from traditional publishers on fairly innocuous topics such as the historical development of the labor movement in the United States, the origins of capitalism, the essays of Clarence Darrow, and the like, along with works that Plaintiffs admit would be properly excluded under the DC-ADM 803 policy.  Plaintiffs assert that disapproving the catalogs goes far beyond what is justified by legitimate security concerns and amounts to an exaggerated response.  We disagree.

This court's review of the 2003 and 2004 AK Press Catalogs reveals that almost every page contains language, pictures and symbols that promote anarchist ideology, _i.e._ content prohibited by DC-ADM 803 VI.F. 3a(3).  While Plaintiffs correctly note that the catalogs offer works to which the instant policy would not apply, the catalogs are full of works and writings advocating anarchy, which are described in pro-anarchy

---

[6]  Plaintiffs concede that certain publications and materials offered in the catalogs would properly be excluded under DC-ADM 803 VI.F. 3a(3).

terms.[7] "Anarchy," i.e., the overthrow of the government, is exactly what the catalogs are aimed at promoting. It is beyond all common sense that such materials easily could lead to violence and disorder as that is precisely what such materials promote. The connection between the need for security in the prison setting for those individuals who chose to ignore the rules of society and the ban of such materials is patently clear. No rational juror could conclude otherwise. The fact that the synopses and/or titles of materials offered for sale are not as detailed or instructional as the texts themselves would obviously be does not lessen their promotional effect. Similarly, the inclusion of other, seemingly innocuous offerings does not lessen the overall promotional bent of the catalogs. There is an obvious, rational connection between a ban of the content of the catalogs and the security threat perceived by the IPRC. As well, Defendant Miller's testimony demonstrates there is a rational relationship between the application of DC-ADM 803 policy and the goal of prison security. See Wolf v. Ashcrost, 297 F.3d 305, 308-10 (3d Cir. 2002). Accord Thompson v. Campbell, 81 Fed.Appx. 563, 566 (6th Cir. 2003) (holding that policy prohibiting anarchy and obscenity materials was reasonable as such materials are incompatible with security, order, and rehabilitation), cert.

---

[7] As but one example, the 2003 catalog offers Reinventing Anarchy, Again and lists the chapters therein as follows: "What is Anarchism? The State and Social Organization, Moving Towards Anarchist Society, Anarchafemenism, Work, The Culture of Anarchy, The Liberation of Self, and, finally, Reinventing Anarchist Tactics." Doc. 22 at Ex. 8, p. 12.

denied, 124 S.Ct. 2071 (2004).  Accord Bahrampour, 356 F.3d at 976 (superintendent's affidavit was sufficient evidence that there was a rational connection between role-playing materials that are based on the impact of simulated physical power used to obtain dominance over others, as opposed to reliance on legitimate authority, and the harmful behavior that can result in a prison); Ray v. Williams, 2005 WL 1429907 (D. Or. June 16, 2005) (granting defendants' summary judgment with respect to decision rejecting books that advocated resistance against authority on basis of security threat perceived by Central Mail Administrator).  See also Duamutef v. Hollins, 297 F.3d 108, 113 (2d Cir. 2002) (upholding decision denying economics book and finding it generally sufficient for a prison official to base a security decision on the title alone  - "[c]onsidering the limited resources of prison systems and the intense pressure to prevent security problems, we cannot expect more of corrections personnel in most circumstances."); Craig v. Cowan, 12 F.3d 1100, 1100 (7th Cir. 1993) (prison officials' confiscation of National Socialist Law Project literature upheld under Turner).

　　　　The second Turner factor requires the court to determine whether Plaintiffs have an alternative method of exercising their First Amendment rights.  When assessing the availability of alternatives, the right in question must be viewed "sensibly and expansively."  Dehart v. Horn, 227 F.3d 47, 53 (3d Cir. 2000) (en banc) (quoting Thornburgh v. Abbott, 490 at

12

417). Courts must consider whether the inmate has alternative means of exercising First Amendment rights generally, not whether the inmate has alternative means of engaging in any particular practice in question. Id. at 55. "If the prison does afford the inmate alternative means of exercising their First Amendment rights, that fact tends to support the conclusion that the regulation at issue is reasonable." Id. at 57.

In this case, the right in question is the right to receive and read publications. As the Supreme Court has instructed, when the regulation permits "a broad range of publications to be sent, received, and read," as does the one here, a court must conclude that alternative means of exercising the right remain open. Thornburgh, 490 U.S. at 418; O'Lone, 482 U.S. at 351-52; Turner, 482 U.S. at 92 (upholding a regulation restricting communication among inmates where other modes of expression remained open). In this case, DOC ADM Policy 803 allows inmates to receive a broad range of publications from outside sources.

Plaintiffs do not refute this fact. Rather, they assert that the AK Press Catalogs are "unique" sources for publications having a far left political perspective and Plaintiffs have no ready alternative available to them to order books of that nature. Plaintiffs offer no support for their claim that they have a First Amendment right to possess far left publications during their tenure in prison and this court has

found none.  Nevertheless, even if the court were to assume the existence of such a right, Defendants would still maintain the authority to disapprove such publications if in their reasonable opinion prison security is at risk.  Thompson v. Campbell, 81 Fed. App. at 566 (citing Thornburgh, 490 U.S. at 417).  Moreover, in order for Plaintiffs to create a question of fact concerning the second Turner factor, they must submit credible evidence that the AK Press Catalogs are the **only** source of exercising their right to receive outside publications, including those espousing divergent political viewpoints.  Plaintiffs have submitted no credible evidence to support such an assertion.  Indeed, Plaintiffs acknowledge that mainstream publishers such as University of California Press, New York Review of Books, Oxford University Press, Simon and Schuster, the Sierra Club, Pennsylvania State University Press, and the like, are represented in the AK Press Catalogs.  Doc. 22, Ex. 10, p. 2-3.  Consequently, it appears that Defendants' actions in restricting Plaintiffs' access to the AK Press Catalogs has not foreclosed all alternative avenues of Plaintiffs' ability to exercise their First Amendment rights.  Accord Shabazz, 482 U.S. at 352 (holding that although there were no alternative means for Muslim prisoners to attend Friday night Jumu'ah services, their ability to participate in other Muslim ceremonies, including special meals and the month-long observance of Ramadan, and to attend prayer and discussion groups, supported the conclusion that the

restrictions at issue were reasonable); <u>Fraise v. Terhune</u>, 283 F.3d 506, 519 (2002) (holding that policy forbidding possession of distinctively Five Percent Nation literature was reasonable in light of fact that the policy allowed inmates to possess, study, and discuss the Bible and the Koran).

  Turning to the third <u>Turner</u> factor, in order to accommodate Plaintiffs' request for the AK Press Catalogs and guard against the potential risk for conflict, prison officials would be required to monitor Plaintiffs' activities -- and potentially those of other prisoners -- more closely to ensure that they were not using the writings, synopses or slogans to exert control and influence over other inmates to promote rebellion and other anarchist ideas.  This additional monitoring would cost limited prison resources.  Moreover, as noted by the Court of Appeals for the Sixth Circuit:

> a policy permitting prisoners to receive materials that advocate anarchy or contain obscenity would have a significant impact on prison guards, other inmates, and the allocation of prison resources.  We cannot ignore "the likelihood that such material will circulate within the prison[,] rais[ing] the prospect of … [a] 'ripple effect.' " <u>Thornburgh</u>, 490 U.S. at 418.  <u>See also</u> <u>Turner</u>, 482 U.S at 92.  While, on this record, we have no reason to believe that Mr. Thompson will rise up against his jailors or engage in deviant sexual conduct should he possess such materials, we cannot discount the possibility that other more volatile prisoners will.  Nor can we discount the costs of requiring prison administrators to allow some prisoners access to such materials while ensuring that others do not gain access to them.  "[T]he courts should defer to the

15

>  'informed discretion' of corrections
>  officials" on questions like these.
>  Thornburgh, 490 U.S. at 418 (quoting Turner,
>  482 U.S. at 90).

Thompson v. Campbell, 81 Fed. Appx. at 567.  Finally, allowing the publication would substantially increase the demands of the IPRC in reviewing the materials inmates would seek to obtain through orders placed from the AK Press Catalogs.  As stated earlier, common sense dictates that publications advocating anarchy have no place in a penal institution.  Thus, the third Turner factor weighs in the Defendants' favor.  Accord Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 530 (E.D. Pa. 2002).

The fourth Turner factor requires courts to assess whether there are alternatives to the regulation that would impose only "de minimis cost to valid penological interests." Turner, 482 U.S. at 91.  "The absence of ready alternatives is evidence of the reasonableness of a prison regulation."  Id. Plaintiffs have not identified a ready alternative to the claimed intrusion.  Accordingly, the fourth Turner factor also weighs in the Defendants' favor.

In summary, this Court concludes that under a Turner analysis, the Defendants' disapproval of the AK Press Catalogs was reasonably related to the legitimate penological interests of maintaining prison security.  Consequently, Defendants are entitled to summary judgment.  An appropriate Order follows.

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROGER BUEHL & NUNO PONTES,    )
         Plaintiffs,          )  Civil Action No. 03-1538
                              )
      vs.                     )  Magistrate Judge Amy Reynolds Hay
                              )
KENT WARMAN; ET AL.,          )
         Defendants.          )
```

**AND NOW**, this 30th day of September, 2005;

**IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment (doc. no. 17) is **GRANTED**.

**IT IS FURTHER ORDERED** that final judgment of this Court is entered in favor of the Defendants, Kent Warman, Thomas L. James, Sharon Burks, Kenneth Miller, John Does, and Robert Does, and against the Plaintiffs, Roger Buehl and Nuno Pontes, pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiffs desire to appeal from this Order, they must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed.R.App.P.

                                   By the Court,


                                   /s/ Amy Reynolds Hay
                                   AMY REYNOLDS HAY
                                   United States Magistrate Judge

```
cc:   Jere Krakoff, Esquire
      429 Forbes Avenue
      1705 Allegheny Building
      Pittsburgh, PA 15219

      Kemal Alexander Mericli
      Office of the Attorney General
      Civil Litigation Section
      564 Forbes Avenue
      6th Floor, Manor Complex
      Pittsburgh, PA 15219
```